is N.F. v. Antioch Unified School District, case number 150780. So, Ms. Whiteleather, I guess you'll proceed. Do you want to save any time for rebuttal or not? Can you hear me okay? Yes, sir. Yes, Your Honor, I was trying to unmute. My apologies. Yes, I would like to save about five minutes for rebuttal. Okay, we'll try to help you, but keep your eye on the clock, if you will, please. Thank you. Please proceed. Thank you. Good afternoon, Your Honors. May it please the Court. I am Tonya Whiteleather. I represent, and I have represented, N.F., a student with a disability, including autism, from sometime in 2017. I participated in three due process hearings pursuant to the Individuals with Disabilities Education Act. N.F. is a 13-year-old young man who resides with his family in the attendance area of the Antioch Unified School District. He was diagnosed with autism, both by Regional Center, before he left the school district for a private placement in 2018, and he's been identified in his IEP as having autism by CAVA, a public charter school in California. The issues, in the first matter, I'm going to try to watch the clock and do five minutes and, of course, allow for questions. The issues were whether Antioch Unified had created necessary behavior records to address his behaviors, and specifically that was data collection. There was significant testimony by Dr. Christine Mead about how important and necessary data collection was, that it wasn't done. The administrative law judge, as well as the district court, made a finding that 92% of the data collection was existed for the 2016-2017 school year and that 95% was collected and existed for the next school year, and the documents don't show that at all. It's closer to 50%. This is Judge Fletcher. Because the time is limited, I'm particularly concerned with the fourth issue, and that is, was there an appropriate response to the report from Dr. Miller that NF was on the autism spectrum? Could you address that? If you don't mind addressing that now rather than working your way through it and getting to it, number four. Absolutely. 34 CFR 300.502 allows for parents to obtain an independent evaluation either by having the district pay for it or by doing it on their own. In this case, the parents did it on their own. There is then a subsequent requirement that once a parent brings an independent assessment to a school district, and this one was provided in 2017, roughly a year after the district claimed it had done an assessment in autism. Well, it didn't just claim it did do one. What about Dr. Lopez? Well, doctor, we don't have any documents for that. Well, we have the report. We have a report that was changed five, six, seven times during the hearing, and we don't have any protocols, which are absolutely crucial. Well, with respect, and I'm joining my colleague in this, we have the Timothy Oak case where basically nothing was done. They had nonprofessionals involved, but in this case you had Dr. Karina Grandison who diagnosed NF with ADHD in July 26, 2015. Then February 1, 2016, your clients, the parents, consented to have NF evaluated by Dr. Valerie Lopes. Her report in May said that he was, it didn't say he had autism, I mean, excuse me, autism, but rather he had ADHD. Apparently your clients got that information because they were not happy with that, and they then acquired the services of Dr. Miller who gave them a report of autism December 6, 2016, but they didn't say anything. They didn't say anything at all until October 3, 2017, and that, excuse me, they shared the autism diagnosis with the school district at an IEP meeting. They didn't ask for anything particularly to be done. In December 15 of the same year, there was a manifestation of some problems. The NF left the school district briefly. The parents refused to conduct an annual IEP meeting. Then they took him out of school and out of the district January 11, 2018. So I ask, I apologize, what could they have done? What, you know, they got a new diagnosis, parents didn't say anything, then it's revealed, then they won't cooperate, then they take the child out of the school district. What's the remedy here? If I may, they always cooperated. I disagree, they went to every IEP except for the one where the district said we're going to have a manifestation determination in January of 18, and we'll give you less than 24 hours. That's actually the next, the second process. That was not an IEP meeting, that was a manifestation determination meeting. IEP members were there, but it was not an IEP meeting. It is part of required meetings under IDEA to which a parent has absolute right. I understand that, but you characterized that as an IEP meeting, but I think it was not. Okay, the distinction between them is very, very slim because an MD is part of the IEP process, and the parents tried to come to that and gave notice. I think they cooperated. Pardon me for sort of distracting us on that point because that's really the part of the next case. I want to come back to what the duty was and why there was a duty in your view once Dr. Miller's report is brought to the attention of the school authorities, and do you contest the timeline that Judge Smith just described in terms of when the school was alerted to Dr. Miller's report? Not at all. Okay. And we have parents who are rather unsophisticated. They have twins, no other children, have some difficult histories in themselves, and did not understand, they're not knowledgeable about special ed. They got the report in 16, absolutely, it didn't give it until 17, but once a district receives an outside assessment, it must review it. Is there any evidence that they didn't do that because at least according to what's in ER 172 and SER 134, the parents refused to conduct an annual IEP meeting at that time. They wouldn't cooperate. Is that right? I don't think that's correct. We've got two references in the record that says that's what happened. I know. But the parents had asked to have an advocate. They were working with an advocate, and they asked the district to have, they needed help and guidance. They asked the advocate to come with them, and they have attended every, I think there was one, maybe two meetings when the advocate was sick once, another time the advocate could not come, and the parents literally said, because it's supposed to be a mutually agreeable date and time under 56341.5, and there are a dozen, at least, IEP meetings at which the parents appeared and talked and discussed, and in the issue. But with respect, counsel, you've got, at least from my perspective, and I think perhaps from my colleagues, you've got the period before the Miller report was made available to the school district, and you've got the period after. And from my perspective, once the school district was told about that, then you've got a different situation. And what I'm seeing in the record here, the parents refused to conduct an annual IEP meeting, notwithstanding the fact that they had just told the school district less than two months before that their child had autism. What am I missing? There were multiple IEP meetings. But what about this particular one? This was the annual IEP. The report says they refused to attend. No, I disagree. The parents did not refuse to attend. I know the report says that. They had come. There were times, as I mentioned, where the parents asked to have the advocate or the times did not work because the district was not giving them timely notice. There was one in November of 17. I believe you may be referring to that. There was an October 17 IEP, October 3rd. They talked about having November. As the date came forward and I was representing the parents, the father called me and said, they haven't given me the required written notice. And I said, well, write to them. And he communicated every email to about seven people, and that's also in the record, saying, are we having the meeting? I haven't had notice. I have to give my employer notice. Nobody got back to him. The parents did not refuse. The district never gave written notice to say, yes, we're actually having this meeting. We generally talked about on October 3rd. Let me ask you this. Do you dispute that the parents removed NF from the school district in February of 2018? Absolutely not. Okay. So you've got this period, either December, what the record seems to show, or some other date, but certainly after the Miller report came in and they took him out. Now, once he's out and allegedly in a different situation, what can they do? What remedy is there for the school district? The school district under IDEA and state law always has a duty to hold an, if it's a district of residence, always has a duty to convene an IEP, to conduct appropriate assessments as necessary, and to offer faith. That is not a duty that they ever lose. If you are a resident of a school district. Because your time is running, let me ask the question in a different way. Let's assume that there's sufficient time for the school district to respond once Dr. Miller's report is brought to their attention, and let's assume that there are no difficulties with respect to attendance at any of the meetings by the parents that are to be laid to the fault of the First, Dr. Lopes' report, and then Dr. Miller's report, or perhaps we should go back to the earlier report of Dr. Grandison as well. First off, is there a distinction for our purposes between on the spectrum, which is what Dr. Miller diagnosed, and autism, which Dr. Lopes refused to diagnose? I notice in the report of Dr. Miller that there are three categories. There's no autism, there's on the spectrum, and there's autism. So is there any reason I should attach importance to the fact that Dr. Lopes says there's no autism, and Dr. Miller says it's on the spectrum? No, I don't believe so. I don't believe there is any distinction between on the spectrum and autism. Let me ask a different question, and that is, the district maintains, and the ALJ relied in part on this, as did the district court, that your client has identified no different treatment that would have been offered had there been a diagnosis of autism in the IEP. Is that right? Do you identify? What did you ask or would you have asked the school district to do differently from what it was doing? To address the identification of autism, to determine what he needed, and that was never done. He was removed. He was removed. The parents didn't place him. The district took him out in January of 2018. They didn't allow the parents to cooperate and be involved in the determination of an alternative placement, and the parents looked at the school, which had had a terrible reputation, the non-public school, and had been, in fact, after the placement, there was a lawsuit regarding abuse of other students. The parents said, no, that's not appropriate, and they privately placed under Burlington and Florence v. Carter and went back and then said, look, we've got him there 45 days. We need an IEP offer, and that's when the district pretty much said, no, sorry, go away, which they don't have the right to do. What relief are you requesting from this court? We are asking for the payments, the services that the parents paid for when they had to provide him with speech and language. With the private education. Counseling, yes, compensatory education. Plus attorney fees. Plus attorney fees. That's the least of our worries. We're trying to get this kid some help. We still can't get him back in the district, and the parents continue to send letters asking that he be returned. He is in, this is another one of the cases, of course, but he is in a charter school that is in, basically assumed responsibility to provide a FAPE, right? That is correct. So what role does the school district, in this case, AUSD, what role does the district play now that another school district has taken charge of this young man's FAPE? He lives in Antioch Unified. He's a resident of the district. The district of residence under California law is obligated to make an offer. So you're saying there can be two different schools that are required to provide the FAPE because of his residence? Yes. To that effect. I look at the Irvine case. I'm trying to think of the recent one. I don't have the citation for it at the moment. I can get that. But there was a recent Ninth Circuit case involving Irvine Unified School District, and the court said just that. The district of residence is responsible. You can't walk away from that under California laws. Even though he's no longer in the district,  elsewhere? They have to make an offer. How does Union v. Smith, 15F3rd, 1519, they have to make an offer? But how does the parent know where he's going to go? And they've been begging repeatedly for that. I know I haven't even had a chance. Your time is up. But as you know, we've got two different cases, so I'm sure we'll be able to cover everything here. So let's hear from the school district, please. Good afternoon, Your Honors. My name is Ivana Berson, and I am counsel for the school district in this case. Would Your Honors want me to address the last issue and Ms. Whiteleather's comments? Yeah, why don't you start with perhaps this comment, which I find unusual, that you can have two different districts responsible to provide the FAPE, even when the child is only in one of the districts or on one of the schools, and the district that's being asked to provide the other FAPE has no control over the child at all. Can you address that, please? Sure. There is no such obligation under the statutes or the decisions, which are multiple and were cited in appellant's opening brief in NF number three, which was taken under submission. I cannot recall off the top of my head the names of those cases, but they are discussed at length in my opening brief. Those cases relate to the obligation of a DOR, the district of residence, when the child is placed in a private school by his parents or by someone else, a guardian, something to that effect. I may be able to save us some time on this one. Taking what you said as true, and that strikes me as correct, I don't think that means that there's no remedy if we were to conclude that the district violated its obligation in ignoring the Miller Report. I'm not saying we would conclude that, but if we were to conclude that, I assume they still have some remedy. Isn't that correct? If this court would conclude that the school district violated its obligation under the IDEA, the student, of course, would have some remedy for that school year where he was enrolled in the NEAC school district, and he did not receive the appropriate fees. So it's not as though his placement in another school has mooted the appeal in this case. No, it has not. And what might that remedy be? Your opposing counsel suggested reimbursement of, I guess, Dr. Miller's expenses. That sounds probably right. Other than that, what remedy might there be, if any? I don't believe there would be any other remedy. The student has been attending a public school. He has not been attending a private school like in other cases where parents had to incur out-of-pocket costs to place the student in a private school. However, I would like to address the issue of the Dr. Miller's report with Your Honor's indulgence. The student had been thoroughly assessed during his time at the district. He was assessed by Dr. Grandison, who did not find autism. When questioned by the ALJ, she testified that autism was not on her radar, quote-unquote. That was not of concern. Dr. Lopes completed a full assessment, and she is a child psychologist. She had all the credentials necessary to conduct this assessment, and she conducted a proper assessment. She did not diagnose the student with autism. She diagnosed him with emotional disturbance, ADHD, other health impairment. This was during the 2015-2016-2017 school years. Parents went ahead and obtained Dr. Miller's report. It is notable, however, that parents repeatedly informed the school district that they agree student does not have autism, that student had not been diagnosed with autism by neither his Kaiser pediatrician nor the independent assessors that they retained. Now let me interrupt, if I may. You say the parents repeatedly told the school district that NF did not have autism. Did they say that after they received Dr. Miller's report? They did not. So they presented Dr. Miller's report, and I believe it was September the 29th, 2016, 2017. On October 3rd, 2017, so a few days later, the school district convened an IEP to discuss assistive technology. During that meeting, this is the first time that the school district was told about Dr. Miller's report. At that meeting, the district and the parents with the IET team proposed to conduct a November 14th IEP meeting to revise the BIP, the Behavior Intervention Plan, and take into account Dr. Miller's diagnosis. It was agreed at that meeting that students' behaviors were still occurring and they were discussed with respect to how he would access technology. Nevertheless, when the district was told that he had been diagnosed with autism, immediately they set up a meeting. They put it in the books. Father agreed. On November 13th, at 9.37 p.m., an email was sent to the school district in which father canceled the meeting. The district sent another notice, I believe it was November 20th, and scheduled the meeting for November 24th, 2017. Prior to that IEP meeting on November 24th, the parents canceled the meeting again. Due to some increasing behaviors, a manifestation determination review hearing was necessary, and that occurred on December 15th, 2017. At that time, the district proposed that an IEP meeting should also be conducted. I would like to back up a little bit. Prior to the meeting, it was conveyed to the parents that they would like to conduct the IEP meeting at the same time with the MDR determination. During the hearing, father refused to conduct the IEP meeting. The IEP team was assembled. They were ready to proceed. He refused to go forward. After that MDR meeting, it was determined that students' behavior were the result of his disability. He was returned to the classroom at no loss of educational benefits. However, winter break came shortly after that. Students' behaviors increased again. He was suspended due to violation of the student conduct. Therefore, the district was under the gun to conduct another MDR meeting in January because they were pressed for time. Under the IDEA, they are required to conduct that meeting within 10 days. Now, appellant has stated that such statutory compliance with the deadline should and could be overlooked according to the DOGC case. We take the position that in DOGC, the reason that this court came to that conclusion and said you have to wait for the parents to agree to attend the meeting because this is an IEP meeting, those facts do not exist in our case. Nevertheless, the district went forward with another IEP meeting with another MDR meeting in January 2018. At which point, again, it was determined that students' behaviors were the result of his disability. Therefore, he was returned to the classroom. However, the parents decided to disenroll him from the district. To go back to your Honor's question, the school district, as soon as he was presented with the Miller Autism Report, responded promptly to it. Also notably, Dr. Miller is not a school psychologist. Dr. Miller only provided a medical diagnosis of autism, which under the IDEA does not necessarily translate to special education services. Under the IDEA, the disability has to be such that it impedes the educational progress of the student. Medical diagnosis on its own is not sufficient. For that reason, perhaps, Dr. Miller did not suggest any special services other than what was already offered to students to be provided due to that new diagnosis at the end of 2017. He did not have the qualifications necessary. Can you help me with the dates of Dr. Miller's report? I have it here in front of me, and it gives me the dates of evaluation. The second date is December 6, 2016, but I don't see a date in which the report was actually signed. Do you know that date? I assume it was fairly soon after the second date of evaluation, but I'm not sure of that. I'm trying to figure out when the parents got the report. Your Honor, I do not have that date in front of me. However, I could find it while my colleague will take the rebuttal. I can inform you with absolute certainty that there were several months after Dr. Miller signed the report before the parents brought it to the attention of the school district. Is there any question that they did not bring the Miller report to the school district's attention until October 3, 2017? That's what the record seems to show to me. Whenever they knew, they didn't bring it to the attention of the school district until October 3, 2017. Is that correct? That is correct, and that is undisputed. I just found the answer to my question in very small print. Electronically signed on January 1, 2017. Dr. Miller signed the report on January 1, 2017. Thank you, Your Honor. The parents did not bring it to the school's attention for 10 months. Going back to the services that appellant contends were not provided, he has the burden of persuasion in this court. He has the burden of persuasion to establish that the LAJ decision and the district court's decision, findings of fact, and adoption of the ALJ's conclusion are clearly erroneous. That is the standard of review. There is absolutely no evidence of any services that student missed out on by virtue of Dr. Miller's report presented to the district in December 2017 prior to his removal from the school district by the parents on February 1, 2018. Since that burden of persuasion has not been met, I respectfully ask this panel to find that not only the ALJ's conclusion is correct, but also that the district court's conclusion is correct, and that she, according to law established in this circuit, accorded great deference to the ALJ's conclusion, because there is simply nothing that appellant pointed out in the record of services that student missed due to presenting the autism diagnosis a mere less than a month prior to his removal by his parents from the school district. So if I can recapitulate what I understand you to have said, you're saying the school district did its evaluations with, I gather, two different people with doctorates, evaluating the student. He was being provided what the IEP called for. When the parents went to Dr. Miller, Dr. Miller is not affiliated with the school district, made no recommendations as to what should be done with respect to NF that was not already being done. And indeed, I think you're saying that she's not qualified to do so, that all along the school district was complying with the rules and that the parents did not cooperate. And as a result, there was, if you will, a break, and the parents decided to remove the student from your school district, which meant, from your perspective, that school district could no longer do anything to control or help the child. Is that a fair summary? That is a fair summary. Once the student was removed to another LEA, local educational agency, with its own obligation under the IDEA to provide an IEP and related services, the school district's hands are tied. If the student chooses to transfer back into the district, even at that point, the district's obligation does not start as soon as the student is enrolled. The student is currently enrolled in a charter school, as I understand it. Is that right? A public charter school. That is my understanding. And that charter school is not part of your school district, right? That is correct. And that charter school has assumed the responsibility to provide a FAPE for NF. Is that right? That is correct. And this currently provides, or at least at the time of the briefing, it was providing an IEP and related services and presumably a FAPE. Okay. Are you saying that the school district doesn't have any responsibility once the child is put in the charter school? Is that your position? I am correct in this case. In this case, because the charter school is a public school, under California law, public charter schools have the obligations themselves to provide FAPE to a student, either themselves if they are their own local educational agency or the local educational agency that granted that charter. Okay. Now, we've gone over time on this one, but we've got two cases, so it will all work out. Do either of my colleagues have additional questions about this particular case? No. Although, just in terms of order, I wouldn't mind hearing a rebuttal on this case. No, I understand. We're going to do that. I just wanted to be sure. I'm fine. Okay. Anything else? I'm good to go. Thank you. All right. So let's then hear again from Ms. Whiteleather. We went over time. Let's give you a couple of minutes for rebuttal, please, if you want to respond then in connection with this particular case. Very quickly. Very key to any assessment and Dr. Lope's assessment is the documentation. We can't begin to challenge that without it. They lost it. They don't have it. Karina Grandison did, upon a reevaluation, did identify NF's autism and testified to that, which we get to later. The 11-13 cancellation of the meeting was the one where there was no written notice. The parents typically have 10 days notice. And Ms. Burson talked about a November 20th notice. We're going to have a meeting in four days. These parents have repeatedly said we have to arrange for child care. We have to arrange for time off work, as does any working parent. And the district didn't give them that courtesy. Let me ask you this. That's the 10-day issue. But, as you know, opposing counsel pointed out two different occasions prior to that where at least the father had agreed to meet and then canceled, which had nothing to do with the 10-day period. Do you agree with that? No, I don't agree with that. The parent asked when he contacted me in November, he said, what am I supposed to do? I don't know if there's a meeting or not. He sent out an email to the district to say, are we having a meeting? Nobody responded. And then to be extra careful, a few days before, he said, nobody's told me. I don't have the notice. I can't attend because he has to give that to his employer. Just if I can give us the, when he was removed, when NF was removed in January, Ms. Burson has misstated the facts. He was not returned to school. He was removed to go to a terrible non-public school. And that's when the parents took their rights into Burlington and said we're going to place him somewhere else in the meantime for a 45-day interim alternative educational placement that they weren't allowed to participate in. The December, I'm sorry, January of 18, MDR was less than 24 hours notice. There was no way the parent could arrange for child care and let the work know what was going on. And at the December 15th, I personally attended December 15th MD meeting, we asked for the behavior plan. And the record is replete with district's attorneys saying, no, you can't have it. It's just a draft. One question that does occur to I think all of us, I assume since the report from Dr. Miller was signed on the 1st of January and the report really wasn't brought to the attention of the school district until sometime in October, why the delay? Do we know? Yes. The parents did not know. They were totally unsophisticated and were not looking for any remedies for that time period. That would be unfair. Were you representing them at that time? No, I was not. I was not involved. At what point do you start representing them? I came in sometime in the fall. I believe I was the one who said something about you need to provide this. They didn't understand. And Regional Center is a very well-respected agency. The fact that she is qualified to talk about what his needs are. She's not a teacher. She's a clinical psychologist. No, that's okay. You answered my question. Thank you. Thank you. Okay. We're going to finish up with this case now. I think we've had an opportunity to discuss this. We're going to submit this particular case, which is NF versus Antioch Unified School District 21-15780.
judges: Siler, FLETCHER, SMITH